**STATE, Plaintiff-Appellee, v. SMITHER, Defendant-Appellant.**

Ohio Appeals, Seventh District, Trumbull County.

No. 1278. Decided September 22, 1952.

Charles H. Anderson Pros. Atty., Fred R. Guarnieri, Paul Moritz, Asst. Pros. Attys., Warren, for plaintiff-appellee.

Clarence H. Klinger, George W. Secrest, Warren, for defendant-appellant.

(SKEEL, J, of the 8th District, sitting by designation in the 7th District in place of PHILLIPS, J.)

## OPINION

By SKEEL, J:

This appeal comes to this court on questions of law from a judgment of guilty of murder in the second decree. The defendant was indicted by

the Grand Jury of Trumbull County, Ohio, in the January, 1952 term, for murder in the first degree. It was the claim of the State that in the early morning hours of January 10, 1952, the defendant entered the home of Helen Smither, the former wife of the defendant, and there, of deliberate and premeditated malice, shot four bullets into her body from a 25-caliber automatic pistol, with intent and purpose to kill the said Helen Smither, and as a result of said gunshot wounds the deceased came to her death.

The defendant claims the following errors:

1. In excluding evidence offered by him that was pertinent to the issues.

2. In admission of evidence offered by the State over defendant's objection.

3. In overruling defendant's motion for a directed verdict at the conclusion of all the evidence.

4. That the verdict is not sustained by sufficient evidence.

5. The verdict is contrary to law.

The evidence discloses that the decedent and defendant were married in 1931 when she was fifteen years of age and he was twenty-two years of age. Six children, now living, were born of the marriage, the oldest at the time of the trial being seventeen years of age and the youngest six years old. The defendant and decedent in the years just prceding the events here under consideration, had considerable domestic trouble. The deceased had filed for divorce on three separate occasions, the last case being filed in September, 1951. This case was tried and a decree of divorce was entered in the Common Pleas Court of Trumbull County on December 19, 1951. The decree awarded custody of the children to the deceased, and ordered defendant to pay alimony to her at the rate of $150.00 per month. The deceased for a number of years prior to her death had worked to augment the family income. The time came in April, 1951, when they were both employed, he as manager and she as clerk or cashier of McAlister Dairy Stores. About this time both the decedent and defendant began, for the first time, the use of tobacco and intoxicating liquor. They formed the habit of going to a night club operated by Chester Miller who was a brother of Helen Smither.

On the night of September 11, 1951, while at the night club they got into a bitter quarrel which continued until they got home when the defendant struck the deceased. This quarrel was the circumstance that precipitated the filing of the last divorce case. The defendant then went to his former home in Iowa for a few weeks. When he returned he tried to effect a reconciliation but the deceased refused all such attempts.

In the early morning of January 10, 1952, the deceased, who had been at the A. G. A. Club with one John Harter (an acquaintence of many years and with whom she had become intimate about the time of filing the last divorce case) left for her home in separate automobiles. On their arrival, the home being at 1379 Hazelwood Avenue, they parked their automobiles in the drive and entered the living room, it being then between three and three-thirty o'clock in the morning, January 10, 1952. The evidence of Harter is to the effect that they stood in the living room for about fifteen minutes embracing each other and then they entered the bedroom which was on the first floor, disrobed and got into bed. In about five minutes, Harter testified, he became aware that there was an intruder in the room. He was standing in an archway between the living room and

the bedroom which was to the right of the foot of the bed, the head of the bed being against the opposite wall. He described the person as a big man wearing a cap and a jacket. This witness testified that the intruder began shooting and shouting at the same time. He also testified that the words used were "something about his house, his home." His testimony was also to the effect that four shots were fired and that the figure then vanished. The evidence of the county coroner is that four bullet wounds were found in the head and body of the deceased which caused her death.

The defendant's son (William, age 17 years) testified that he was awakened some time after 3 A. M. by noise below, and that he heard his father's voice say, "Right in my own home," or "trying to take my house." The witness Harter testified that after the shooting he dressed, asked the son to call the police and waited until they arrived a few minutes later. He later drove one of the police officers to the police station where he made a signed statement. The police during their investigation at the scene found four 25-caliber shells that had been fired from the automatic pistol to the right and front of the bed; some were on a night table at the head of the bed, others on the floor.

The defendant testified that he had come to Warren from Youngstown to see his wife around 8 or 9 o'clock P. M., the evening of Jan. 9, 1952. He went to the store where she was employed, saw she was busy and so went to a tavern. When he returned to the store, the store was closed and she had left, so he returned to Youngstown. Not being able to sleep, he dressed in his work clothes, took a bus to Warren leaving at about 12:45 A. M. the morning of January 10th, arriving in Warren about a half hour later. He was wearing a cap and jacket of the type described by Harter. He testified that the purpose of the trip was to see his former wife. He walked to a point near the front of the house and seeing her automobile was not there, went to the bus station for a cup of coffee. He returned to the street where his wife lived and noticing that she had not yet returned, he started to hitch-hike to Youngstown. Not being able to get a ride, he testified he decided to walk to Niles, Ohio, to get the first Warren-Niles-Youngstown bus.

The evidence of the officers is to the effect that they were notified by radio to go to 1379 Hazelwood Road at 4 A. M.; that they arrived there within two or three minutes and after viewing the premises and sending the deceased to a hospital in an ambulance, one police patrol started to search the community for a man of the description given by Harter. Other surrounding police departments were notified by radio and a crusier of the Niles police department arrested the defendant about two and one-half miles from the deceased's residence, walking toward Niles, Ohio. The time of his arrest was 5 A. M. He did not have a pistol on his person at the time of his arrest. He made no inquiry as to the cause of his arrest. He was asked what he did with the gun, and his answer was, "What are you talking about?" The defendant from the hour of his arrest has steadfastly proclaimed his innocence.

The first claim or error has to do with the rejection of evidence offered by defendant as to statements made by the deceased with regard to intimate relations with Harter and another, and what she was going to do if an illegitimate child was born. The purpose of the proffered testimony

was to show that there were others, particularly Harter, who might be desirous of causing the death of Helen Smither.

Error was not committed in rejecting this evidence. The manner of its presentation was in violation of the hearsay rule. The witnesses who were called upon to testify were asked as to what they had heard the deceased say on the subject of her relations with Harter. Such evidence is clearly inadmissible.

The second claim of error is concerned with receiving into evidence over the objection of defendant the signed statement of John Harter given to the police on the morning of Jan. 10, 1952. Such written statement ordinarily would not be admissible. The witness was in court and testified directly to all the matters of which he had knowledge which included the information contained in the statement received into evidence. However, the record discloses that on cross-examination the defendant clearly opened the door for the introduction into evidence of the statement and for that reason its introduction did not prejudice the defendant's rights. Such claim of error is therefore overruled.

The third and fourth claims of error are concerned with the overruling of defendant's motion for a directed verdict at the conclusion of all the evidence and the further claim that the verdict is not sustained by sufficient evidence. These claims must be overruled for the reason that there is substantial evidence in the record to support both the overruling of the motion and the verdict.

The final claim of error is that the verdict is contrary to law. The basis of this claim is that because the evidence of the State tends to show that the deceased, the former wife of the defendant, was shot while in bed with Harter, that if the defendant did kill her he must have done so while in hot blood created by an adequate provocation and the degree of the homicide should have been reduced to first degree voluntary manslaughter.

The trouble with such a claim is that it is not supported by evidence. The defendant makes no such claim. He denies being in the house at all. He testified that he had no knowledge of the relationship between his former wife and Harter. If he was the one who killed the deceased, he must have journeyed to Warren armed with a loaded automatic pistol. There is evidence to the effect that he had threatened to kill his wife should she divorce him or eject him from the house. Both of these circumstances came to pass. The jury, upon substantial evidence, has concluded that he did purposely kill Helen Smither. In all events, this question was submitted to the jury under proper instructions and the jury's verdict is clearly supported by the evidence.

Some question might be raised as to whether as a matter of law the relationship between the deceased and the defendant (they having been divorced prior to Jan. 10, 1952), and the circumstance as shown by the state's evidence, was such that the defendant could claim an adequate or reasonable provocation upon which a charge of murder could be reduced to manslaughter. But assuming such to be the fact, unless there is some evidence that he did act while laboring under a sudden passion, that his mind was in fact enraged because of an adequate provocation, the existence of such provocation could be of no help to him. There is not one word of evidence as to the state of the defendant's mind at the

90

time of the shooting and rage or passion cannot be presumed. Clark & Marshall on the Law of Crimes, Paragraph 256. This claim of error is therefore overruled.

For the foregoing reasons, the judgment of the Common Pleas Court is affirmed. Exceptions noted.

NICHOLS, PJ, GRIFFITH, J, concur.